THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KEITH COLEMAN, Defendant-Appellant.

First District (1st Division) No. 1—86—0409

Opinion filed July 22, 1991.—Modified on denial of
rehearing January 27, 1992.

Randolph N. Stone, Public Defender, of Chicago (Karen A. Popek and Stephen L. Richards, Assistant Public Defenders, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Kathleen F. Howlett, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant Keith Coleman appeals the judgment of the circuit court of Cook County, which, following a jury trial, found defendant guilty of murder and two counts of armed robbery and concurrently sentenced him to 35 years' imprisonment for murder and 15 years' imprisonment for armed robbery. For the following reasons, we affirm.

The record on appeal indicates the following. Defendant was charged by indictment with the murder of Elijah Taylor and the armed robbery of Elijah Taylor and Ruby Terrell. Dennis Fox, Nathan Haley and Kenneth Walls were also charged in this matter.

THE SUPPRESSION HEARING

Before trial, the trial court held a hearing on defendant's motion to suppress statements made by defendant to the police on the grounds that the statements were obtained in violation of his right to counsel under both the fifth and sixth amendments to the United States Constitution.

Defendant testified that at the time of the first interrogation relating to this case (January 30, 1985), he had three indictments pending against him and was incarcerated in the Cook County Department of Corrections. Defendant then testified that the first officer to interrogate him in this matter, Detective O'Connor, thought that defendant knew his constitutional rights. It is unclear from defendant's testimony whether Detective O'Connor only partially read defendant his *Miranda* rights or whether the *Miranda* warnings were perfunctorily read. The defendant presented his attorney's business card to Detective O'Connor, but did not explicitly ask for an attorney to be present during the interrogation. Defendant had been placed in a lineup relating to the Taylor murder; defendant testified that Detective O'Connor told him that he had been positively identified in that lineup and that Dennis Fox had made a statement implicating him in the Taylor murder. Defendant denied involvement in the murder at that time.

Defendant was also interrogated by Officers Tuider and McKinley. Defendant testified that he showed these officers his attorney's card as well, but that Officer Tuider declined to call the attorney because it was after 5 p.m. Defendant gave an oral statement to the officers after about an hour of interrogation and later gave a written statement to an assistant State's Attorney. Later, a court reporter was called in. According to defendant, the officers did not read him the *Miranda* warnings at this interrogation session.

Leonard Petersen, an employee of the Cook County Department of Corrections, testified to the policies of the jail which permitted interrogation concerning crimes unrelated to defendant's incarceration without first attempting to contact defendant's attorney.

Detective O'Connor testified that he read the required *Miranda* warnings to defendant and that defendant stated he understood them. O'Connor denied that defendant showed him an attorney's business card and that he told defendant that someone else had given the police a statement about the case.

Assistant State's Attorney Zehe testified that he also interviewed defendant on January 30, 1985. Zehe also testified that he read the *Miranda* warnings to defendant, after which defendant agreed to

speak to Zehe about the case. Zehe stated that the warnings were read again prior to defendant making a statement in the presence of a court reporter. Zehe denied knowing that defendant was represented by counsel on the unrelated charges, but admitted knowing that defendant was incarcerated on other charges at the time of the interrogation. Zehe and defendant went over the court-reported statement together and reread the *Miranda* warnings.

The trial court found that defendant's sixth amendment right to counsel had not attached on the Taylor murder charges. Consequently, defendant's sixth amendment rights had not been violated. The trial court further found that full *Miranda* warnings were given to the defendant and that defendant had freely and voluntarily waived his fifth amendment rights. Therefore, there was no violation of defendant's fifth amendment right to counsel either. The trial court thus denied the motion to suppress defendant's statements.

### THE MOTION FOR SEVERANCE

The common law record indicates that three of the four men charged in this matter moved for severance from a joint trial (the fourth, Kenneth Walls, entered into a plea agreement with the State). Dennis Fox's motion was granted; the other two motions were denied. Thus, defendant and Nathan Haley were tried jointly.

### THE TRIAL

Kenneth Walls testified pursuant to a plea agreement with the State's Attorney's office under which the State agreed to recommend concurrent 10-year sentences for the armed robbery in this case and in an unrelated case in exchange for his testimony. At this time, Walls had known Nathan Haley and defendant for a few years and Dennis Fox for five or six months. The four men were close friends and Walls often visited the apartment of Fox and Haley to talk and "get high." Walls further testified on direct examination that defendant was occasionally at this apartment, but testified on cross-examination that defendant always accompanied him to the apartment.

During the late evening of December 17 and early morning of December 18, 1984, Walls was socializing, drinking beer and smoking marijuana and "sherm" (PCP-coated marijuana) at Fox and Haley's apartment; defendant was there also. Between midnight and 1:30 a.m., Walls, Fox, Haley and defendant drove to a White Castle restaurant at the corner of 79th and Loomis.

The White Castle was diagonally across the street from the Impala Lounge, which was owned and operated by Elijah Taylor, who

(according to Elijah's brother's testimony) was also known as "Pete." Walls testified that he and defendant had been in the Impala Lounge a couple of times but that defendant was not a regular patron.

The four were eating hamburgers in their parked car. Walls testified that Dennis Fox returned to the White Castle for carry-out service and defendant walked over to the Impala Lounge, but did not enter because the door was locked. Walls testified that defendant and Fox returned to the car, at which time defendant stated that the Impala Lounge was about to close, that Pete keeps a lot of money and suggested robbing Pete.

Two women and a man then walked out of the Impala Lounge and drove away. Walls testified that defendant said the car was Pete's but that Pete was not the man who had left. A short time later, the car returned. On direct examination, Walls testified that defendant said "Pete's car is back," but admitted under cross-examination that, at Fox's trial the previous week, Walls had testified that Fox said this. The car was driven by one of the women who had previously left. The woman wore a beige coat.

Walls further testified that a man holding a paper bag then got in the car, but admitted on cross-examination that he told the police that there were two women in the car, not one, and that the man held several bags. Walls testified that defendant identified the man as Pete, stated that he probably had money in the bag and suggested that the four men should rob Pete and that it would be easy to do so.

Walls then testified that both defendant and Fox suggested that they follow Pete's car. According to Walls, defendant directed him to drive to 68th Street, then to an alley running parallel to Loomis Street. The car stopped. Fox asked defendant to accompany him, but defendant declined on the ground that Pete might recognize him. Fox asked Walls, but then said "you're driving." Finally, Fox asked Haley, who agreed to go with Fox.

Walls testified that as Fox and Haley left the car, he saw Fox withdraw a pistol from his trousers, but admitted on cross-examination that he had testified at Fox's trial only that he could see the handle of a gun protruding from Fox's waistband. Walls stated that the gun belonged to defendant, but later admitted that he had kept the gun at his house in a tennis racket case. Walls admitted to not seeing defendant with the gun that evening, not knowing how long Fox had possessed the gun and not hearing any discussion between defendant and Fox concerning the gun that evening.

Walls further testified that Fox and Haley ran down a gangway, while he and defendant remained in the car with the motor running,

but with the lights and radio off. According to Walls, he was about to drive away when defendant told him not to worry because Fox and Haley knew what they were doing. Walls also testified that he feared that Fox would injure him and defendant if they drove away, but later admitted that when he had previously told the police about these events, he did not mention defendant's alleged assurances.

Walls then heard a woman scream. A short time later, Fox and Haley came running back from the gangway and jumped into the car. Defendant had opened a back door of the car. Fox was holding the gun and a beige coat resembled the one worn by the woman who drove Pete's car; Haley held a woman's purse. Fox ordered Walls to go and the car sped off. When asked what happened, Fox stated that a "punk" grabbed him and that he "popped" the punk. Fox searched a wallet, but found no money; Fox also mispronounced Elijah Taylor's name at that time. Haley searched the purse, but only found public aid cards and medicine bottles. The name "Ruby" was mentioned in reference to the contents of the purse.

Walls testified that Haley wore a light blue jacket, a black and white striped sweater, black corduroys, a maroon scarf and black and white gym shoes. Fox wore white gym shoes.

Fox expressed annoyance, stating that he thought Pete was going to have some money. Defendant was silent. Walls dropped defendant at his home, at which time Fox gave defendant the beige coat for defendant's sister. Walls then dropped off Haley and Fox and went home, but walked back to Fox and Haley's apartment 10 minutes later. Defendant was not there. Fox stated: "I thought Keith said that they were going to have some money." All four men went to a hospital later that morning to seek treatment for a gunshot wound suffered by Haley in an unrelated incident. Walls then testified to a conversation which occurred four days later in which Fox asked defendant what he had done with the gun and that defendant replied, "I got it in a safe place."

On cross-examination, Walls admitted that in a previous statement to the police, he attributed all of Haley's actions that evening to defendant because Haley had not been arrested or taken into custody, whereas defendant was already in custody on unrelated charges. Thus, Haley's name did not appear in this earlier statement.

Ruby Terrell testified that on the night and morning in question, she went from the Dynasty Lounge, where she worked, to the Impala Lounge. She drove two friends home from the Impala in Pete's car. She then returned to the Impala to wait for Pete. Pete came out of the Impala carrying a paper bag which contained sausage and eggs.

Terrell and Taylor then drove to Taylor's home, where they intended to cook breakfast. As the two entered the vestibule of the building, Fox appeared, wielding a pistol. Fox shot Taylor and demanded money from him. Taylor responded that he didn't have any money. Fox summoned a second man who helped Fox wrestle Taylor to the ground. Fox ordered the second man to go through Taylor's pockets; the second man took Taylor's wallet. Fox snatched a necklace from Terrell's neck, demanded money which he thought Terrell had hidden in her brassiere and took her coat and purse. The two men then fled the scene.

Harvey Taylor, the victim's brother, testified that Elijah Taylor had owned and operated the Impala Lounge for about 18 years, that Harvey worked at the Impala six days a week and that when he arrived home early in the morning in question, his wife and daughter told him that Elijah had been shot. Harvey also testified that Elijah died about 35 minutes after he arrived at the hospital.

Detective Harold Hoffman testified that he spoke to Haley while he was in the hospital and remembered that Haley was wearing a blue jacket, a black and white sweater, dark pants and gym shoes. He also spoke to Walls and Fox.

Robert Young, Taylor's neighbor, testified that he heard someone say "Take off that damn jacket" at about 3 a.m. in the morning in question. Young saw two black men running from the scene with their backs turned; one wore a navy blue jacket, a wine-colored scarf and white sneakers. Young heard coins hitting the ground and saw the two men run into a gangway. Young then heard the sound of a car ignition shortly thereafter.

The State put on three witnesses, including Ronald Caldwell, to establish that a gun recovered by police had previously been in the possession of defendant. Sergeant Donald Smith testified that a bullet removed from Elijah Taylor matched the gun recovered by the police. Dr. Diane Scala-Barnett, a forensic pathologist, testified that Elijah Taylor died of a gunshot wound to the abdomen.

Detective O'Connor testified that he requested that defendant, Fox and Walls stand in a lineup viewed by Ruby Terrell and Robert Young. Terrell identified Fox, but not defendant. O'Connor then met with defendant and read the *Miranda* warnings which defendant said he understood, at which time defendant agreed to speak with him and Officer Tuider. Defendant later had a conversation with Assistant State's Attorney Zehe. O'Connor also testified that the police then questioned Walls and brought Haley in for questioning.

Officer Tuider testified that defendant told him that the four men were sitting in the White Castle parking lot on the morning in question, that Fox ordered Walls to follow the victim's car, that defendant refused to accompany Fox because the victim might recognize him, that Haley left with Fox and that when the two returned, Fox had the pistol and coat and Haley had the purse.

A court-reported statement made by defendant was introduced into evidence. Defendant stated that on the morning in question, he had been "getting high" at Fox's house and that the four men drove to the White Castle. Fox walked over to the Impala Lounge for cigarettes, but it was closed. When Fox returned to the car, he asked if Pete had any money. Before defendant could reply, Fox asked him whether either of two men leaving the Impala was Pete, to which defendant said "No." Fox then said that Pete must still be inside and that they would wait. Defendant then asked "What, you going to rob that place?" Fox answered in the affirmative while holding a gun. Two women and a man then left the Impala in Pete's car. After about five minutes, the car returned and Pete got in. Fox asked defendant if that was Pete and if he had any money on him. Defendant responded in the affirmative upon which Fox declared, "This ought to be easy, follow him."

The court-reported statement then recounts the events up through Fox and Haley's return to the car. Defendant asked Fox if he shot Pete, to which Fox allegedly replied, "man, that punk grabbed my arm." Haley rifled through the purse and Fox complained to defendant: "[D]amn, damn, I thought you said he was going to have money." Defendant replied that he thought Pete had money. Walls then drove to a central location from which the others departed. Defendant's statement goes on to say that Fox later gave the gun to defendant, who in turn gave it to Ronald Caldwell.

Officer Tuider further testified that Haley refused to give a court-reported statement but agreed to sign a summary of his oral statement. The statement was then introduced. The four men went to the White Castle. Defendant went to the Impala for cigarettes and returned upon finding it closed. Defendant said that Pete had to have money. Haley said he knew Pete owned the Impala because defendant had told him. Defendant stated that the Impala should be closing. Fox suggested that the four men rob Pete. Three people left the Impala. Fox asked if any of them was Pete, to which defendant said "No." The car drove away and returned with one person. A man exited the Impala, whom defendant identified as Pete. Fox "told him" to follow the car.

Fox asked defendant to accompany him; defendant refused because Pete knew him. Fox asked Haley to go with him. Fox entered Taylor's building, while Haley stood one house away to watch for cars. Haley heard a shot and saw Fox emerge from the building with a coat, a wallet and a gun in his hand. The two ran back to Walls' car. Fox went through the wallet and became angry upon discovering there was no money in it. Walls and defendant returned to Walls' house, while Haley and Fox went to Fox's house.

Defendant did not testify at trial. Codefendant Haley did testify, denying he was at the scene of the crime and claiming he was at his girl friend's house when the crime took place. Haley stated that when he was arrested, he was handcuffed to a filing cabinet in the police station and was shown the statement. He signed the statement after being beaten on the face and chest. Haley denied robbing Terrell and Taylor and murdering Taylor.

Detectives O'Connor and McKinley, Assistant State's Attorney Zehe, Wayne Kinzie, a jail paramedic, and Dr. Sirish Parikh, a jail doctor, all testified that they had not observed any signs that Haley had been beaten. Haley's girl friend testified that a picture of Haley taken after his arrest showed a "busted lip" that she had not seen before his arrest.

Following jury instructions and closing arguments, the jury found defendant guilty of murdering Elijah Taylor and of the armed robbery of Taylor and Ruby Terrell. The trial court sentenced defendant to 35 years on the murder charge and 15 years for the armed robbery, to be served concurrently.

Defendant now appeals, contending that: (1) the trial court erred in denying his motion to suppress statements he made to the police; (2) the trial court erred in denying his motion for severance where he was unable to cross-examine codefendant Haley about statements Haley made to the police; (3) the trial court erred in denying his motion for severance where Haley's defense was antagonistic to his own; (4) the State used peremptory challenges to exclude African-Americans from his jury, thus denying his right to a fair trial; (5) the admission of evidence and argument concerning defendant's incarceration on unrelated robbery charges denied him his right to a fair trial; (6) the trial court erred in refusing to excuse two jurors for cause; (7) the admission of hearsay statements of the police to Kenneth Walls constitutes reversible error; (8) the closing arguments of codefendant Haley's counsel denied him a fair trial; (9) the trial court erred by instructing the jury before closing arguments; (10) the trial court erred by refusing to further instruct the jury on a question of law

during jury deliberations without notice to counsel; and (11) his sentence is excessive.

Defendant's first argument on appeal is that the trial court erred in denying his motion to suppress statements he made to the police. Defendant claims that these statements were obtained in violation of his rights to counsel guaranteed by the fifth and sixth amendments to the United States Constitution. According to defendant's brief, his retention of counsel in the unrelated cases pending against him at the time of the custodial interrogations in this matter constitutes an invocation of his rights to counsel under both the fifth and sixth amendments which would make the interrogation in this matter improper.

■■ ■ The United States Supreme Court has rejected the argument that a criminal defendant's invocation of his sixth amendment right to counsel is also an invocation of his fifth amendment right to counsel. (*McNeil v. Wisconsin* (1991), 501 U.S. ___, 115 L. Ed. 2d 158, 111 S. Ct. 2204; see also *People v. Bryant* (1990), 202 Ill. App. 3d 290, 559 N.E.2d 930 (rejecting defendant's argument); *People v. Jackson* (1990), 198 Ill. App. 3d 831, 556 N.E.2d 619 (same); *cf. People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228 (rejecting similar argument based solely on the sixth amendment).) We therefore conclude that defendant's acceptance of counsel on unrelated charges did not also operate to invoke a protection against interrogation concerning the offenses involved in this appeal.

■■ ■ Defendant's next two arguments assert that the trial court erred in denying his motion for severance. Generally, " 'defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice.' " (*People v. Byron* (1987), 116 Ill. 2d 81, 92, 506 N.E.2d 1247, 1251, quoting *People v. Lee* (1981), 87 Ill. 2d 182, 187, 429 N.E.2d 461, 463.) Defendant asserts that he suffered two common forms of prejudice. The first occurs when a nontestifying codefendant has made out-of-court admissions that implicate the defendant. Introduction of such statements into evidence, even if the jury is giving limiting instructions not to consider the statements against the defendant, can violate the latter's sixth amendment right of confrontation. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541-42, 468 N.E.2d 969, 973, citing *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) The second type of prejudice occurs when the defendants present defenses that are so antagonistic that it is unfair to try them together. (*E.g., People v. Bean* (1985), 109 Ill. 2d 80, 93, 485 N.E.2d 349, 355.) The decision

to deny a motion for severance is reviewed under an abuse of discretion standard, based on the information the trial court had at the time the motion was made. *People v. Lee* (1981), 87 Ill. 2d 182, 186, 429 N.E.2d 461, 463.

■ It is settled that the admission at trial of a statement by a nontestifying codefendant which implicates the defendant violates a defendant's sixth amendment right to confront witnesses against him (*Bruton*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620), essential to which is the right of cross-examination (*Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065). Conversely, the confrontation clause is not violated by the admission of such a statement where the codefendant testifies at trial and is subject to full and effective cross-examination. *Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723; see *People v. Jones* (1988), 169 Ill. App. 3d 883, 897-98, 524 N.E.2d 593, 602.

In *Nelson*, defendant O'Neil and codefendant Runnels were charged with kidnapping, robbery and vehicle theft. At their joint trial, a police officer testified that Runnels made an oral statement following his arrest which implicated both himself and O'Neil in the crimes with which they were charged. The trial court instructed the jury that the statement was admissible against Runnels but could not be considered as evidence against O'Neil. Both O'Neil and Runnels offered the same alibi defense. Runnels further testified on direct examination that he had not made the statement attributed to him and that its substance was false. The prosecutor cross-examined Runnels; counsel for O'Neil did not. Both men were both found guilty, but O'Neil's conviction was later overturned on the basis of *Bruton*, which had been decided during the pendency of his appeal. *O'Neil v. Nelson* (9th Cir. 1970), 422 F.2d 319.

The Supreme Court reversed, ruling that a constitutional violation under *Bruton* occurs only where the out-of-court statement is made by a declarant who is unavailable at trial for " 'full and effective' cross-examination," and then proceeding to consider "whether cross-examination can be full and effective where the declarant is present at the trial, takes the witness stand, testifies fully as to his activities during the period described in his alleged out-of-court statement, but denies that he made the statement and claims that its substance is false." *Nelson*, 402 U.S. at 627, 29 L. Ed. 2d at 227, 91 S. Ct. at 1726.

■ Noting that Runnels had denied making the statement attributed to him and in fact testified favorably to O'Neil, the Court reasoned:

"Had Runnels *** 'affirmed the statement as his,' [O'Neil] would certainly have been in far worse straits than those in which he found himself when Runnels testified as he did. For then counsel for [O'Neil] could only have attempted to show through cross-examination that Runnels had confessed to a crime he had not committed, or, slightly more plausibly, that those parts of the confession implicating [O'Neil] were fabricated. This would, moreover, have required an abandonment of the joint alibi defense, and the production of a new explanation for [O'Neil's] presence with Runnels in the white Cadillac at the time of their arrest. *To be sure, Runnels might have 'affirmed the statement' but denied its truthfulness, claiming, for example, that it had been coerced, or made as part of a plea bargain. But cross-examination by [O'Neil's] counsel would have been futile in that event as well.* For once Runnels had testified that the statement was false, it could hardly have profited [O'Neil] for his counsel through cross-examination to try to shake that testimony. If the jury were to believe that the statement was false as to Runnels, it could hardly conclude that it was not false as to [O'Neil] as well.

The short of the matter is that, given a joint trial and a common defense, Runnels' testimony respecting his alleged out-of-court statement was more favorable to [O'Neil] than any that cross-examination by counsel could possibly have produced, had Runnels 'affirmed the statement as his.' It would be unrealistic in the extreme in the circumstances here presented to hold that [O'Neil] was denied either the opportunity or the benefit of full and effective cross-examination of Runnels.

We conclude that where a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments." (Emphasis added.) *Nelson*, 402 U.S. at 628-30, 29 L. Ed. 2d at 228, 91 S. Ct. at 1727.

■ The record in this case presents the situation posed by the *Nelson* Court in which the codefendant "affirms the statement as his," yet denies its truthfulness and alleges the statement was coerced. The Court characterized cross-examination by defendant's counsel in such a situation as "futile;" defendant has not offered any

reason to disagree with that characterization in this case. Defendant has merely asserted that he could have underscored Haley's favorable testimony, which is insufficient to escape the rationale of *Nelson*.[1]

■ Defendant argues in his reply brief that Haley's hearsay statement should have been excluded under our State's law of evidence. (*E.g., People v. Duncan* (1988), 124 Ill. 2d 400, 413-14, 530 N.E.2d 423, 429.) Defendant has waived this argument by failing to raise it in his initial brief. *Dial v. Mihalic* (1982), 107 Ill. App. 3d 855, 438 N.E.2d 546.

■ ■ Even if defendant had not waived the argument and was correct on this point, defendant would not be entitled to a new trial as the error was harmless. In order for an error to be held harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. (*Chapman v. California* (1967), 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827; *Fahy v. Connecticut* (1963), 375 U.S. 85, 86-87, 11 L. Ed. 2d 171, 173, 84 S. Ct. 229, 230.) In deciding whether an error is harmless, the court must review any effect the unlawfully admitted evidence may have had upon the other evidence introduced at trial and the conduct of the defense. (*Fahy*, 375 U.S. at 87, 11 L. Ed. 2d at 173-74, 84 S. Ct. at 230-31.) Because confessions carry extreme probative weight, the admission of an unlawfully obtained confession seldom is harmless error. (*People v. St. Pierre* (1988), 122 Ill. 2d 95, 114, 522 N.E.2d 61, 69.) Nevertheless, defendant's claim is subject to the harmless error rule. *People v. Curtis* (1989), 190 Ill. App. 3d 207, 215, 546 N.E.2d 624, 628.

■■ Here, defendant was convicted on an accountability theory. A person is accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).) Consent to or mere knowledge of the commission of a crime does not constitute the

---

[1]One could argue (though defendant did not) that *Nelson* is distinguishable by interpreting it as requiring not only that the codefendant deny the earlier statement, but also testify favorably to the defendant. This argument, however, has failed where the codefendant did not implicate the defendant at trial. Compare *United States v. Brown* (2d Cir. 1983), 699 F.2d 585 (violation of *Bruton* where there was no common defense or favorable testimony, but codefendant implicated defendant in the crime), with *United States ex rel. Pugach v. Mancusi* (2d Cir. 1971), 441 F.2d 1073 (effective cross-examination is possible where defendant merely affirms the statement but denies its truthfulness).

aiding, abetting, planning or commission of that offense. (*People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174, 190; *People v. Washington* (1970), 121 Ill. App. 2d 174, 181.) The mere presence of a defendant at the scene of the crime does not render him or her accountable (*Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190; *People v. Ruiz* (1982), 94 Ill. 2d 245, 256, 447 N.E.2d 148, 152; *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10, 460 N.E.2d 847, 850), even when coupled with defendant's flight from the scene or knowledge that a crime was being committed. *Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190.

■■ On the other hand, our courts have never held that active participation in an offense is a prerequisite to establishing accountability. (*Ruiz*, 94 Ill. 2d at 254, 447 N.E.2d at 151.) Evidence of events surrounding and following the commission of the crime is competent to show participation in the crime itself. (*Ruiz*, 94 Ill. 2d at 257, 447 N.E.2d at 152; *People v. Morgan* (1977), 67 Ill. 2d 1, 9, 364 N.E.2d 56, 60; *People v. Washington* (1962), 26 Ill. 2d 207, 209, 186 N.E.2d 259, 261.) Words of agreement are not essential to establish a common purpose to commit a crime. (*Ruckholdt*, 122 Ill. App. 3d at 10-11, 460 N.E.2d at 850.) Rather, "proof that the defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors which the trier of fact may consider in determining the defendant's legal accountability." (*Ruckholdt*, 122 Ill. App. 3d at 11, 460 N.E.2d at 850; see *People v. Grice* (1980), 87 Ill. App. 3d 718, 725, 410 N.E.2d 209, 216.) Defendant's flight from the scene may also be considered by the jury. *People v. Dotson* (1986), 143 Ill. App. 3d 135, 142, 492 N.E.2d 903, 907.

Two examples of legal accountability may be instructive. In *Reid*, defendant did nothing to discourage the others who committed the crimes, nor did he indicate any disapproval. Defendant was present during the perpetration of the offenses, did not extricate himself from participating in the offenses and fled the scene of the crime. He also maintained a close affiliation with the others afterwards and failed to report the crimes. These acts and omissions were voluntary. The supreme court upheld the conviction, concluding that the evidence of defendant's behavior before, during and after the commission of the crimes indicated a common design to do an unlawful act to which defendant assented. *Reid*, 136 Ill. 2d at 64-65, 554 N.E.2d at 191-92.

Similarly, in *Morgan*, defendant was present while several people planned to rob the victim. He told the others he would accompany them, but would not participate and did not want any money. Defend-

ant watched the fatal beating of the victim. According to one witness, defendant received part of the proceeds of the crimes, though defendant denied receiving any money. The supreme court held that defendant's acquaintance with the participants in the crimes, his voluntary and deliberate presence at the scene of the crimes, his knowledge of the plot to rob the victim, a venture which contained a risk of violence, and the evidence that he received money from the crimes sufficiently supported defendant's convictions. *Morgan*, 67 Ill. 2d at 9, 364 N.E.2d at 60-61.

█ In this case, the jury heard Kenneth Walls testify that defendant was in the car used to follow the victims; identified Elijah Taylor and Taylor's car; was aware of the plan to rob Elijah Taylor; and directed Walls to the alley near Taylor's two-flat. Walls also testified that defendant remained in the car while Fox and Haley committed the offenses and opened the car door in anticipation of Fox and Haley returning to the car. Walls further stated that Fox gave the stolen beige coat to defendant and that defendant accompanied him, Fox and Haley to the hospital later that morning, where Haley was treated for a gunshot wound. Finally, Walls testified that four days after the offenses were committed, he heard defendant assure Fox that the gun used to commit the offenses was in a safe place.

The State also presented a number of witnesses to establish that Taylor died of a gunshot wound and that the bullet had come from a gun which had previously been in defendant's possession.

As in *Reid* and *Morgan*, the jury in this case could have found defendant guilty beyond a reasonable doubt on the basis of the testimony listed above. Indeed, defendant concedes elsewhere in his brief that " '[i]f believed by the jury, [Walls'] testimony, standing alone, is sufficient to convict [defendant]. It is [Walls'] testimony that recites every detail of the evening's activities.' " (Defendant's brief at 68, quoting *People v. Cobb* (1983), 97 Ill. 2d 465, 478, 455 N.E.2d 31, 36.) While defendant denied receiving any proceeds of the crimes, the same could be said of the defendant in *Morgan*. Moreover, the jury would not have heard this denial if defendant's statement had been suppressed. Defendant maintains that Walls was severely impeached, but Walls' overall testimony at trial was, if anything, less inculpatory (as to defendant) than his initial statements to the police. Given the record presented here, the jury could have found defendant guilty beyond a reasonable doubt without Haley's statement, rendering its admission harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 23, 17 L. Ed. 2d at 710, 87 S. Ct. at 827.

■ Defendant next argues he was prejudiced by the failure to sever because he and Haley presented defenses that were so antagonistic that it is unfair to try them together. (*E.g.*, *Bean*, 109 Ill. 2d 80, 485 N.E.2d 349.) For example, in *People v. Braune* (1936), 363 Ill. 551, 2 N.E.2d 839, the seminal case on "antagonistic defenses," our supreme court reversed the convictions of two doctors charged with manslaughter arising from a criminal abortion. Each defendant asserted his innocence, accused the other and attempted to discredit the other's witnesses. "The trial was in many respects more of a contest between the defendants than between the People and the defendants. It produced a spectacle where the People frequently stood by and witnessed a combat in which the defendants attempted to destroy each other." (*Braune*, 363 Ill. at 557, 2 N.E.2d at 842.) It is generally not sufficient that a codefendant's theory may be inconsistent or contradictory to defendant's theory; genuine hostility between the defenses is typically required before a conviction is reversed. See *People v. Lekas* (1987), 155 Ill. App. 3d 391, 408, 508 N.E.2d 221, 232.

■ In this case, defendant relies upon *Bean*, which is distinguishable. Codefendant's counsel purportedly commented on defendant's failure to testify during closing arguments, but the record indicates that counsel merely referred to the fact that Haley took the stand in the course of discussing Haley's testimony. In his brief, defendant asserts that Haley's counsel stated in closing that

"the story [of the murder and robbery] had been concocted in the jail by some people already in jail on an armed robbery and my client got on the stand and testified that he had never been convicted of a crime. He was out on the street living with his wife, you heard from *him* in this case." (Emphasis in brief.)

However, the record shows that the final sentence quoted by defendant actually reads: "He was out on the street living with his wife, who you heard from in this case." The statement as it appears in the record merely refers to Haley's testimony and thus does not demonstrate that Haley's counsel commented on defendant's decision not to testify. This case does resemble *Bean* insofar as the codefendant presented an alibi defense. However, the codefendant in *Bean* also claimed that Bean was the murderer from the opening arguments through the entire trial and closing arguments. Indeed, the codefendant in *Bean* stated that he intended to assert Bean's guilt in his own motion for severance. (*Bean*, 109 Ill. 2d at 86, 485 N.E.2d at 352.) The record in this case shows that defendant merely hypothesized at the hearing on the motion for severance that the defenses could become antagonistic.

Defendant also cites *People v. Johnson* (1989), 187 Ill. App. 3d 756, 544 N.E.2d 392. *Johnson* is distinguishable because the defense theories there were directly contradictory; the defendant's theory was that codefendant committed the offense, whereas codefendant asserted that defendant aided him in committing the offense. (*Johnson*, 187 Ill. App. 3d at 765, 544 N.E.2d at 397.) In contrast, Haley's theory was that he was not present during the offense, which logically would render Haley incapable of personal knowledge implicating defendant. Thus, the defenses may have been inconsistent or contradictory, but not antagonistic. In *Johnson*, we also noted that defendant's opening statement implicated the codefendant. (*Johnson*, 187 Ill. App. 3d at 765, 544 N.E.2d at 397.) Here, Haley's opening statement implicated Fox, not defendant.

This case more closely resembles *Lekas* (155 Ill. App. 3d at 391, 508 N.E.2d at 221), in which Phillip and Christopher Lekas were jointly tried and convicted of murder, armed robbery and aggravated arson. On appeal, this court held that Phillip's convictions need not be reversed for failure to sever. The court noted that Phillip's counsel, in moving for severance, explained that his theory would be that Phillip sat in a car while Christopher committed the crimes. "At this point, the real possibility existed that Christopher would attempt to pin the blame for the entire crime on Phillip, since Phillip was willing to place himself at the scene." (*Lekas*, 155 Ill. App. 3d at 406, 508 N.E.2d at 232.) Nevertheless, after analyzing *Bean*, the court concluded that there was no abuse of discretion in Phillip's case because Christopher did not argue that Phillip was to blame.

Here, defendant has failed to point to any part of the record indicating that Haley directly implicated defendant in the commission of the offenses. Haley's counsel did refer to defendant's incarceration on uncharged offenses, an issue which this court addresses separately later in this opinion. Defendant objected to that reference, but not on the basis that the statement placed blame on him and made Haley's defense antagonistic. Failure to *specifically* object at trial can result in waiver of the objection. Our supreme court has long recognized:

> "Failure to make proper and timely objection to the admission of evidence claimed to be incompetent or otherwise objectionable or to move to strike it out after its admission, *giving specific reason for the objection or motion to strike out such evidence* generally constitutes a waiver of the right to object and cures the error, if any." (Emphasis added.) *People v. Trefonas* (1956), 9 Ill. 2d 92, 98, 136 N.E.2d 817, 820, quoted in *People v. Collins* (1985), 106 Ill. 2d 237, 263, 478 N.E.2d 267, 278.

■ In sum, at the time the motion for severance was heard, the trial court here was faced with nothing more than defendant's apprehension that an unfair trial would result at the time the motion was denied, which does not, by itself, require severance. (*Lee*, 87 Ill. 2d at 186, 429 N.E.2d at 463.) That defendant has failed to demonstrate by citation to the record that the trial became a "spectacle" further supports the conclusion that defendant was not denied a fair trial. *Lekas*, 155 Ill. App. 3d at 406-07, 508 N.E.2d at 232.

■ Defendant's fourth argument is that the trial court erred in the jury selection process by not conducting a hearing under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. In *Batson*, the Supreme Court held that under the equal protection clause of the fourteenth amendment, a prosecutor cannot exercise peremptory challenges of potential jurors on account of race. (476 U.S. at 89, 90 L. Ed. 2d at 82-83, 106 S. Ct. at 1719.) *Batson* applies retroactively to this case, which was pending on direct review at the time *Batson* was decided. See *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708.

■ ■ To establish a violation of *Batson*, defendant must first make a *prima facie* case of discrimination (*Batson*, 476 U.S. at 93-94, 90 L. Ed. 2d at 85-86, 106 S. Ct. at 1721), which can be shown from the State's use of peremptory challenges in a single case. (476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) If a *prima facie* case is shown, the burden shifts to the State to supply race-neutral reasons for excluding the venirepersons. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) A trial court's decision on this issue will not be overturned unless it is against the manifest weight of the evidence. *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, 539 N.E.2d 1172, 1184.

The circumstances relevant to the trial court's consideration of whether a *prima facie* case has been made include: a pattern of racial exclusion; the prosecutor's questions and statements during jury selection; the disproportionate use of peremptory challenges to exclude a racial group; whether the sole common characteristic of the excluded persons was their race; and the race of the defendant, victim and witnesses. A court cannot decide this question solely by reference to the number of members of a group which are excluded. *Mahaffey*, 128 Ill. 2d at 413, 539 N.E.2d at 1184.

■ In this case, defendant joined in his codefendant's motion for a mistrial, asserting that the State had used at least half of its peremptory challenges to exclude African-Americans and Hispanic-Americans. Defendant failed, however, to note the race of any of the

excluded venirepersons for the record, save one. Defendant has therefore waived any objection to the jury selection except as to that one juror whose race appears in the record. (See *People v. Evans* (1988), 125 Ill. 2d 50, 62, 530 N.E.2d 1360, 1364.) This jury was selected prior to *Batson*; nevertheless, at that time, defendant was still required to make an adequate record before a reviewing court would recognize a claim under either the earlier *Swain* standard (which placed a heavier burden on defendants than *Batson*) or the *Batson*-type standards that had been recognized in an opinion of this court (*People v. Payne* (1982), 106 Ill. App. 3d 1034, 436 N.E.2d 1046), which was later reversed by our supreme court on review (*People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202). (See *People v. Dotson* (1986), 143 Ill. App. 3d 135, 150, 492 N.E.2d 903, 913 (Johnson, J., specially concurring); *People v. Fleming* (1980), 91 Ill. App. 3d 99, 106-07, 413 N.E.2d 1330, 1335.) Thus, defendant was on notice that a record would be required if his claim were to be recognized on appeal. The record presented by defendant as to whether venirepersons of color were struck in this case fails to meet either the earlier *Swain* standard or the current *Batson* standard.

As to the claim concerning the single remaining juror, the record in this case indicates that although the trial court initially indicated it did not wish to hear from the State, the State spontaneously and contemporaneously offered an explanation of its peremptory challenge, namely the venireperson's statement that he might be partial to the defendants in the case.[2] The record further indicates that the trial court accepted the State's representation that the peremptory challenges were not exercised on account of race.

Given the sufficiency of the record as it relates to this juror, we find it unnecessary to remand the cause for a *Batson* hearing. (*Cf. People v. Hope* (1990), 137 Ill. 2d 430, 461, 560 N.E.2d 849, 863 (reviewing court need not remand where, despite record deficiencies, record equals or exceeds what normally would suffice for review).) The record indicates that the trial court followed a procedure quite similar to that envisioned by *Batson* concerning this juror and determined that it would not declare a mistrial. Under the circumstances in this case, defendant could not make a *prima facie* case under *Batson* and has failed to show that the trial court's denial of the motion for

[2]Although the venireperson stated that he would be able to lay aside any partiality after further questioning by the trial court, the prosecutor's explanation need not rise to the level justifying a challenge for cause. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

mistrial was against the manifest weight of the evidence. *Mahaffey*, 128 Ill. 2d at 413, 539 N.E.2d at 1184.

■■■ Defendant's fifth argument on appeal is that the admission of evidence and argument concerning his incarceration on pending unrelated robbery charges at the time of his interrogation denied him a fair trial. As to Walls' testimony, defendant has waived this objection by failing to specifically object at trial. (*Collins*, 106 Ill. 2d at 263, 478 N.E.2d at 278; *Trefonas*, 9 Ill. 2d at 98, 136 N.E.2d at 820.) Although defendant timely objected to Walls' testimony concerning defendant's incarceration on unrelated charges, he did not give a specific reason for the objection or move that the testimony be struck. Consequently, defendant cannot raise the issue on appeal.

■■■ The argument would have failed to persuade the court in any event, based on the record presented on appeal. It is true that mere proof of a defendant's previous arrest on unrelated charges cannot be introduced against a criminal defendant due to the prejudicial effect such inflammatory evidence can have on a jury. (*People v. Lampkin* (1983), 98 Ill. 2d 418, 429-30, 457 N.E.2d 50, 56; *People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238, 242; *People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288, 290.) The State is also barred from making closing arguments that are designed only to inflame a jury. (See *People v. Whitlow* (1982), 89 Ill. 2d 322, 433 N.E.2d 629.) Moreover, the State cannot admit evidence of other crimes for the purpose of proving defendant's propensity to commit crimes. See *People v. King* (1986), 109 Ill. 2d 514, 530, 488 N.E.2d 949, 958.

Nevertheless, evidence of other crimes is admissible if relevant for any other purpose, such as showing knowledge, intent, motive, design, plan, or identification. (*E.g., People v. Carlson* (1982), 92 Ill. 2d 440, 442 N.E.2d 504.) Moreover, where the door to a subject is opened by the defense on cross-examination, the State may, on redirect, question the witness to explain or clarify matters brought out during cross-examination. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 444, 521 N.E.2d 38, 57.) The State may question a witness on redirect in such a way as to remove unfavorable inferences or impressions raised during cross-examination. (*Thompkins*, 121 Ill. 2d at 444, 521 N.E.2d at 57; *People v. Hampton* (1962), 24 Ill. 2d 558, 561, 182 N.E.2d 698, 700.) The decision to admit or exclude such evidence is within the discretion of the trial court. *People v. Chambers* (1989), 179 Ill. App. 3d 565, 577, 534 N.E.2d 554, 560.

■■■ In this case, defendant attempted to impeach Walls' testimony by getting Walls to admit that Walls' January 25 statement to

the police attributed Haley's acts to defendant. On cross-examination, defendant's counsel attempted to establish that Walls left Haley out of the earlier statement in order to protect Haley. Defendant got Walls to admit that he did not want to get Haley in trouble. In doing so, however, defendant "opened the door" for the State to ask Walls on redirect examination why Walls had initially imputed Haley's acts to defendant. Walls replied that he did so because defendant was already incarcerated on the unrelated charges.

Had the State been precluded from asking this question, the jury would not have known why Walls wished to shield Haley but not defendant, which would have unfairly supported defendant's theory that Walls was biased in favor of Haley and against defendant. The record on appeal indicates that the trial court barred further inquiry on the issue by sustaining defendant's second objection. The trial court may have determined that the probative value of this information, limited in scope, outweighed its prejudicial impact on defendant. (*E.g., People v. Harris* (1980), 91 Ill. App. 3d 112, 114, 414 N.E.2d 755, 757.) Given these facts and circumstances, we cannot say that the limited admission of such testimony amounted to an abuse of the trial court's discretion.

██ Nor can we say that the use of this information in closing arguments was so prejudicial that defendant was denied a fair trial. Attorneys are granted "considerable leeway" in their closing and rebuttal arguments; a reviewing court will accord the trial court every reasonable presumption in the exercise of its discretion concerning argument to the jury. *E.g., People v. Simms* (1988), 121 Ill. 2d 259, 269, 520 N.E.2d 308, 312.

In this case, defendant cites three references to defendant's incarceration on unrelated charges during the closing arguments. First, Haley's counsel referred to defendant's incarceration in the course of arguing that the State was presenting a story created by defendant, Fox and Walls. This reference appears earlier in this opinion. Although counsel later mentioned that Haley had never been convicted of a crime, given the facts and circumstances of this case, we are unable to say that this reference (to information the introduction of which was invited by defendant) was so inflammatory as to deny defendant a fair trial.

The State's references were even less prejudicial. The first reference merely repeated the point made by Walls' testimony, *i.e.*, that Walls attributed Haley's acts to defendant in the initial statement to the police because he knew that defendant was already incarcerated and Haley was not. The State's second reference was made in re-

sponse to Haley's argument that Haley would not have wanted to speak to the police upon his arrest and that his statement was coerced; the State argued that Haley's knowledge that the police had already spoken to defendant, Fox and Walls during their incarceration influenced his decision to speak to the police.

In sum, defendant has failed to demonstrate that the testimony and argument in this case, even taken together, were sufficiently inflammatory to mandate reversal of defendant's conviction.

Defendant's sixth argument is that the trial court deprived him of a fair trial by failing to remove two of the potential jurors for cause. Defendant asserts that one juror had poor hearing and that another initially exhibited a hesitancy about his ability to be fair and impartial. Defendant concludes that these jurors should have been excused, or at least that the trial court should have made further inquiry as to the jurors' abilities. Moreover, defendant contends that he need not show actual prejudice because his right to peremptorily challenge members of the venire was burdened, citing *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, and various Federal appellate decisions.

▪ Defendant, however, has failed to point to anything in the record demonstrating that he exhausted his peremptory challenges, thus waiving any objection to the named jurors. (See *People v. Ford* (1960), 19 Ill. 2d 466, 475, 168 N.E.2d 33, 38.) Defendant also waived the issue by failing to raise it in his post-trial motion. *Reid*, 136 Ill. 2d at 38, 554 N.E.2d at 179; *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180-81, 415 N.E.2d 1027, 1029.

▪ The argument is not persuasive in any event. It is beyond dispute that a fair trial requires fair jurors. (*E.g., People v. Cole* (1973), 54 Ill. 2d 401, 411, 298 N.E.2d 705, 711.) However, the trial court has broad discretion in jury selection (*People v. Goff* (1985), 137 Ill. App. 3d 108, 484 N.E.2d 414); defendant must show an abuse of that discretion to obtain a reversal. *People v. Bowen* (1980), 87 Ill. App. 3d 221, 408 N.E.2d 993.

The record here indicates that the trial court ascertained that the potential juror with the alleged hearing problem could properly hear him and would notify the court if she could not hear something at trial. The trial court also determined that the potential juror who initially expressed a hesitancy when asked if he would be impartial would lay aside any such hesitancy.

These factors distinguish this appeal from the cases cited by the defendant, which concerned the failure of a trial court to allow further questioning of an accepted juror where there was evidence that

the juror may have falsely answered a question during *voir dire* or was predisposed to finding defendants guilty. (*E.g., People v. Mitchell* (1984), 121 Ill. App. 3d 193, 459 N.E.2d 351.) Here, the alleged problems with the venirepersons were known to the trial court, which then asked questions and apparently was satisfied with the answers given. The trial court is in a better position than this court to evaluate potential jurors, which is one of the reasons why *voir dire* is largely left to the discretion of the trial court. Moreover, in contrast to the cases cited by defendant, the jurors in this case were not accepted; rather, they were dismissed through the use of defendant's peremptory challenges.

As to defendant's *Swain* argument, we note that *Ham v. South Carolina* (1973), 409 U.S. 524, 527-28, 35 L. Ed. 2d 46, 50-51, 93 S. Ct. 848, 850-51, while holding that the trial court was required to ask about racial prejudice during *voir dire*, also stated:

> "[T]he trial judge was not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by petitioner. \*\*\* In this context, either of the brief, general questions urged by the petitioner would appear sufficient to focus the attention of prospective jurors on any racial prejudice they might entertain.

> The third of petitioner's proposed questions was addressed to the fact that he wore a beard. While we cannot say that prejudice against people with beards might not have been harbored by one or more of the potential jurors in this case, \*\*\* [t]he trial judge's refusal to inquire as to particular bias against beards, after his inquiries as to bias in general, does not reach the level of a constitutional violation."

*Ham* supports the discretion afforded to the trial court in conducting *voir dire* and the conclusion that the procedure followed in this case did not amount to an abuse of that discretion.

■ Defendant's seventh argument is that the trial court erred by allowing the State to elicit hearsay testimony that the State did not offer Kenneth Walls lenient treatment at the time he made statements implicating defendant in the offenses in this case. Defendant failed to raise this issue in his post-trial motion, thus waiving the issue for appellate review. *Reid*, 136 Ill. 2d at 38, 554 N.E.2d at 179.

■ Defendant next argues that he was deprived of a fair trial because Haley's counsel elicited testimony and made arguments which informed the jury that Dennis Fox had been convicted of the offenses and that Kenneth Walls was guilty of the offenses as well. Defendant

did not request that the jury be admonished with regard to the purposes for which the guilty plea was admitted and did not tender a jury instruction on this issue, which constitutes waiver of any objection on review to the absence of such an instruction. (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331; *People v. Peebles* (1983), 114 Ill. App. 3d 684, 449 N.E.2d 230.) Defendant also failed to raise this issue in his post-trial motion as well, resulting in waiver. *Reid*, 136 Ill. 2d at 38, 554 N.E.2d at 179.

■■ ■ The argument is unpersuasive in any event. It is settled that evidence that a codefendant or accomplice has pleaded guilty or has been convicted of the same offense is inadmissible at trial for purposes of proving the guilt of a defendant, but such evidence is admissible for impeachment purposes. (*People v. Sullivan* (1978), 72 Ill. 2d 36, 42, 377 N.E.2d 17, 20.) In addition, when the confession itself is not admitted and the codefendant does not testify that the confession implicated defendant, or when the codefendant fully testifies concerning the crime, including the codefendant's participation, a reversal is not required. (*People v. Baker* (1959), 16 Ill. 2d 364, 372-73, 158 N.E.2d 1, 6.) The appellate court has also recognized that an individual case may present a scenario not envisioned within the general prohibition against introducing evidence of a codefendant's conviction. *People v. Callaway* (1989), 185 Ill. App. 3d 136, 540 N.E.2d 1153.

■■ The record here indicates that Haley's counsel did mention Fox's trial and conviction as well as Wall's plea agreement in opening argument. However, the trial court sustained defendant's subsequent objections, preventing counsel from emphasizing Fox's conviction or Walls' plea agreement in the manner held reversible in *Sullivan*. (See *Callaway*, 185 Ill. App. 3d at 143, 540 N.E.2d at 1157.) The record also indicates that the testimony cited by defendant concerning Walls' plea agreement was elicited by Haley's counsel to impeach Walls, which is not error under *Sullivan*. Moreover, the record shows that Walls had not officially entered a plea as of the date of his testimony and that he fully testified about the offenses, including his own involvement in them, making his testimony similar to that allowed in *Baker*. Finally, the record here shows the jury was instructed:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (hereinafter IPI Criminal 2d).)

Because the jury was alerted to the posture in which Walls' testimony was to be evaluated, any possible prejudice that could have arisen from his admission of guilt does not rise to the level of plain error. (See *Peebles*, 114 Ill. App. 3d 684, 449 N.E.2d 230.) Consequently, defendant has failed to show that he was denied a fair trial based on the record before this court.

▆▆▆ Defendant's ninth argument is that the trial court erred by instructing the jury prior to closing argument of counsel rather than after closing arguments as provided by the Illinois Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(i).) Defendant failed to raise this issue in his post-trial motion, thus waiving the issue for appellate review. *Reid*, 136 Ill. 2d at 38, 554 N.E.2d at 179.

Even if the argument was not waived, we believe it to be without merit. Although defendant correctly notes that this court has previously characterized the practice defendant complains of as "procedural error" in the appeal of Dennis Fox (*People v. Fox* (1988), 177 Ill. App. 3d 602, 532 N.E.2d 472), defendant has incorrectly taken that phrase out of context. In *Fox*, this court stated:

> "While we believe the better approach would be to follow the guidelines of the statute which provides for the trial judge to instruct the jury after the closing arguments of counsel, we cannot say the procedural error here rises to such a level as to require reversal. The record reveals that the able trial judge delivered the instruction to the jury in a clear, accurate and complete manner. While he deviated from established trial court practice, we find no error in the manner in which he delivered the instructions." (*Fox*, 177 Ill. App. 3d at 614, 532 N.E.2d at 479-80.)

Defendant has failed to demonstrate why the same conclusion should not obtain in his appeal.

▆▆▆ Defendant's tenth argument is that the trial court erred by failing to instruct the jury on matters of law during jury deliberations without notifying defense counsel. The record indicates that during deliberations, the jury sent a note to the trial court asking whether the jury could consider defendant's court-reported statement against Haley and whether someone could be found guilty of one offense and not guilty of another. The trial court returned the note with the following message: "Ladies and gentlemen please read the instructions. They will answer all your questions."

Defendant failed to raise this issue in his post-trial motion, thus waiving the issue before this court. (*Reid*, 136 Ill. 2d at 38, 554

N.E.2d at 179.) By failing to raise the issue in his post-trial motion, defendant has acquiesced in the trial court's answer to the jury's question and cannot later complain that the trial court abused its discretion. *People v. Dunigan* (1981), 96 Ill. App. 3d 799, 828, 421 N.E.2d 1319, 1340; see *People v. Clark* (1972), 52 Ill. 2d 374, 391-92, 288 N.E.2d 363, 372.

Even if defendant had preserved the argument for appellate review, we would have found it meritless.

It is beyond dispute that jurors are entitled to have their questions answered. (*Clark*, 52 Ill. 2d at 391, 288 N.E.2d at 372.) A trial court has a "duty to instruct the jury where clarification is requested, the original instructions are incomplete, and the jurors are manifestly confused." (*People v. Gathings* (1981), 99 Ill. App. 3d 1135, 1138, 425 N.E.2d 1313, 1316, quoted in *Reid*, 136 Ill. 2d at 39, 554 N.E.2d at 179.) "Where a jury has raised an explicit question on a point of law arising from the facts over which there is doubt or confusion, the court should attempt to clarify the question in the minds of the jury members." (*People v. Jackson* (1980), 89 Ill. App. 3d 461, 479, 411 N.E.2d 893, 906, quoted in *Reid*, 136 Ill. 2d at 39, 554 N.E.2d at 179.) This duty may arise even if the jury received proper instructions. *People v. Flynn* (1988), 172 Ill. App. 3d 318, 323, 526 N.E.2d 579, 583, cited in *Reid*, 136 Ill. 2d at 39, 554 N.E.2d at 179.

■■ Nevertheless, under the proper circumstances, a trial court may decline to answer a jury's question when the jury instructions are easily understandable and sufficiently explain the relevant law, further instructions would not serve a useful purpose or would potentially mislead the jury, or the jury's inquiry involves a question of fact. (*Reid*, 136 Ill. 2d at 39, 554 N.E.2d at 179 (and cases cited therein).) A trial court may also refuse to answer the jury when the question is ambiguous and an answer or explanation might require a colloquy between the court and the jury, further explanation of the facts, or an expression of the trial court's opinion on the evidence or outcome of the case. *Reid*, 136 Ill. 2d at 39-40, 554 N.E.2d at 180.

■■ In this case, the instruction concerning the use of a codefendant's statement clearly and sufficiently explained the law. (See IPI Criminal 2d No. 3.05.) Consequently, defendant has not established that the trial court was required to answer the jury's first question.

Defendant points out that the *Bruton* Court felt that this type of instruction would often be disregarded and asserts that this case proves that the *Bruton* Court's assumption is correct. Although a question regarding the use of defendant's statement against Haley could suggest

the instruction was not sufficiently noticed by the jury, it could equally suggest that it was noticed by the jury. We also note again that this particular case is governed by *Nelson* rather than *Bruton*. Thus, defendant's speculation as to what the jury may have done does not mandate a reversal under the circumstances of this case.

Defendant further argues that the trial court was required to answer the question because a simple "no" answer would have sufficed and would not have suggested a particular outcome. While the trial court could have considered this point in deciding whether to directly answer the question (and perhaps it did), this argument does not mandate a reversal on appeal. (*Reid*, 136 Ill. 2d at 42-43, 554 N.E.2d at 181.) Moreover, this argument overlooks the record, which shows that defendant's counsel agreed to an instruction which did not name either defendant or Haley. The record further shows that the jury in this case asked if defendant's statement could be used against Haley, not vice versa. Even if defendant were correct in arguing that the judge should have answered "no" to this question, defendant has failed to demonstrate that the court was required to go further in this instance and tell the jury that Haley's statement could not be used against defendant.

As to the jury's second question, concerning whether someone can be found guilty of one offense and not guilty of the other, the record indicates that the jury again received a full and complete set of instructions on the applicable law. The jury received Illinois Pattern Jury Instructions on, *inter alia*, the presumption of innocence (IPI Criminal 2d No. 2.03), legal accountability (IPI Criminal 2d No. 5.03) and the definitions and elements of both murder and armed robbery (IPI Criminal 2d Nos. 7.01, 7.02, 14.01, 14.02). The jury also received four verdict forms: (1) not guilty of murder, (2) guilty of murder, (3) not guilty of armed robbery, and (4) guilty of armed robbery. (IPI Criminal 2d Nos. 26.02, 26.05.) It is apparent the trial court concluded that the instructions sufficiently apprised the jury of the applicable law. Indeed, the *Reid* jury was provided with substantially equivalent instructions. (See *Reid*, 136 Ill. 2d at 40, 554 N.E.2d at 180.) Thus, under the circumstances in this case, the trial court did not abuse its discretion by referring the jury to the written instructions.

We also find *Flynn* (172 Ill. App. 3d at 323, 526 N.E.2d at 583), which defendant cites for support, distinguishable. While the appellate court in *Flynn* reversed a conviction because the trial court did not properly answer the jury's questions, that case had a factual scenario different from that of this case. *Cf. Reid*, 136 Ill. 2d at 43, 554 N.E.2d at 181.

 In sum, while the trial court could have directly answered the jury's questions, there was no duty to do so under the circumstances of this case. As the record on appeal indicates, the jury received a complete set of written instructions. The trial court apparently determined that the jury was not manifestly confused and that the written instructions settled any confusion the jury displayed. Hence, we conclude the trial court did not abuse its discretion.

Defendant cites *People v. Beck* (1922), 305 Ill. 593, 137 N.E. 454, for the proposition that the trial court erred in answering the jury's questions without notifying and consulting with defense counsel. Even if the *ex parte* nature of the communication were deemed error, defendant's conviction will not be reversed where no injury or prejudice has resulted. (*E.g., People v. Walker* (1982), 91 Ill. 2d 502, 440 N.E.2d 83.) In this case, where the jury was given complete instructions and the trial court's "answer" to the jury's questions was to merely refer the jury back to those instructions, defendant has failed to demonstrate prejudice.

 Defendant's final argument is that the trial court erred in sentencing him to 35 years' imprisonment. Defendant further asserts that the trial court refused to take his rehabilitative potential into account.

The trial court's decisions in regard to sentencing are given great deference, and the sentence of a trial court will be affirmed in the absence of a clear abuse of discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 547; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884.) In sentencing a defendant, the trial court may consider the gravity and circumstances of the offense, as well as defendant's mental capacity, age, demeanor and credibility. (*E.g., Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.) Furthermore, the trial court must balance the objectives of protecting society and rehabilitating the defendant. (See *People v. Harris* (1989), 187 Ill. App. 3d 832, 844, 543 N.E.2d 859, 866.) Once struck, a reviewing court will hesitate to upset this balance, especially where the sentence falls within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641, 649.

The record indicates that the trial court found that there was little or no rehabilitative potential in this case. However, the record in this case also indicates that the trial court considered mitigating material in defendant's presentence report and aggravating factors in arriving at this sentence. Moreover, defendant was sentenced to 35 years' imprisonment for murder and 15 years' imprisonment for armed robbery; these sentences do fall within the statutory guidelines for the charged offenses. (See Ill. Rev. Stat. 1983, ch. 38, pars. 1005—8—1(a)(1), (a)(3).)

Accordingly, even assuming *arguendo* that the trial court erred in assigning no weight to defendant's potential for rehabilitation, such error would be harmless under the facts and circumstances presented in this case. *People v. Hall* (1987), 159 Ill. App. 3d 1021, 513 N.E.2d 429.

For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

BUCKLEY, P.J., and O'CONNOR, J., concur.