THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFFREY FLYNN, Defendant-Appellant.

First District (5th Division)   No. 86—633

*Opinion filed June 30, 1988.*

Steven Clark and Deborah Liebow, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Lynda A. Peters, and Charles E. Antonietti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

After a jury trial, defendant Jeffrey Flynn was convicted of armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)) and sentenced to 16 years' imprisonment. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt, he was prejudiced by the trial judge's failure to properly respond to two written requests from the jury propounded by it during its deliberation, and his sentence is excessive. We reverse and remand the cause for a new trial.

This action arose from an incident which occurred on February 19, 1985, in the apartment of Chestina Humphrey for which defendant was arrested and subsequently charged by indictment on 32 counts (eight counts of aggravated criminal sexual assault, five counts of aggravated kidnapping, five counts of unlawful restraint, five counts of home invasion, and one count each of criminal sexual as-

sault, attempted armed robbery, kidnapping, and armed robbery). Prior to trial, the State nol prossed 25 counts; defendant was therefore charged with one count of aggravated criminal sexual assault, criminal sexual assault, attempted armed robbery, armed robbery, and home invasion. During trial, after the evidence had been presented and prior to the jury's deliberation, the State also nol-prossed the attempted armed robbery charge. A codefendant, Ronald Daniels, was charged and indicted separately with these same offenses. While defendant chose to proceed with a jury trial, Daniels waived his right to a jury trial and chose to proceed by way of a simultaneous bench trial.

The evidence at trial was as follows. Defendant testified that he met Money White (Chestina Humphrey's brother) and Ronald Daniels at approximately 11 a.m., bought himself and the two men some liquor, and later they went to Humphrey's apartment. Present in the apartment were Helen Jones, Humphrey's niece, Jones' 13-year-old son Reginald, Jones' grandmother, R.T. and James White, and Raymond Green. Defendant observed that the men were "packaging up some reefer." Around noon, R.T., James, and Green left the apartment. Defendant, Daniels and Money White continued to drink while Jones was cooking in the kitchen. Sometime thereafter, Jones began flirting with defendant and asked him into a bedroom where they engaged in consensual sexual relations. Defendant subsequently went to the living room and fell asleep on a couch. When he woke up, Humphrey was in the apartment and told him to leave her "place of business." Upon leaving the apartment, defendant discovered that he was missing $75 and told Humphrey, who refused to give him back the money. Defendant then threatened to reveal that drugs were being sold out of the apartment, and Humphrey told him to come back the next day for his money. Defendant insisted on the return of his money immediately, Humphrey offered him nine "Happy Sticks" ("reefer" dipped in PCP), defendant refused the drugs, and Humphrey told him to come back the next day for the money. The next day, while on his way to the apartment to retrieve his money, defendant was arrested; defendant had no weapon or money on his person at that time.

The State presented six witnesses at trial. Helen Jones testified that at approximately 2:30 p.m. she was in the kitchen of Humphrey's apartment when Money White and defendant arrived. Sometime later she heard defendant leave the apartment. Still later, she heard a knock on the door and responded, "Come in." Defendant entered with Ronald Daniels, he "pulled a gun," announced a "stick-up," and told Jones to go to the back of the apartment. Daniels made Helen lay on

the floor and threatened her with a stick with nails protruding from it, and defendant and Daniels tied Jones' hands behind her back with a telephone cord. They also tied up Jones' grandmother and Reginald; they put Jones' grandmother into a closet and Reginald was left lying on the floor next to Jones. Money White was in the room but was left untied. Thereafter, defendant handed his gun to Daniels and raped Jones. Daniels then gave the gun back to defendant and he raped Jones. Jones stated that she screamed during this time and defendant told her to be quiet or he would kill her. Defendant subsequently demanded $400 from Jones and, when she stated she did not have any money, defendant told her he had "orders to kill" everyone in the house. Approximately 15 minutes later there was a knock at the door and R.T. White, James White, and Raymond Green entered the apartment. Defendant left the room, came back and threatened Jones' life if she called the police, then left the apartment. Approximately one-half hour later, Jones' brother arrived at the apartment, Jones told him she had been raped, and the police were called.

Reginald Jones testified defendant had come to the apartment the day of the incident, left sometime later, then returned with Ronald Daniels; that he, his mother, uncle and great-grandmother were taken to a back room of the apartment and that they were all tied up except for his uncle; a cloth was placed over his head and he was placed on the floor next to his mother, while his great-grandmother had been put in a closet; Daniels had a stick in his hand; defendant heard a knock on the door and left the room to answer it; he did not hear his mother being raped or fighting off Daniels and defendant; he was later untied by his cousin or great-grandmother; and he thought defendant was still in the apartment after he was untied but Daniels was not there.

R.T. White testified he went to Humphrey's apartment at approximately 3:30 p.m. with his brother James and a friend, Raymond Green; the door was open when they arrived; defendant and Daniels were in the apartment; defendant stuck an object hidden by a coat into his stomach and ordered him to Humphrey's bedroom; Daniels did not come into the bedroom with defendant; defendant ordered the men to lay down on the floor and, when they refused, defendant told them to empty their pockets; when defendant demanded $400 from them, White told defendant he only had 70 cents but that his aunt, Humphrey, would be home at 4 p.m. and she might have some money; that defendant made him look under Humphrey's bed and mattress for money; and he did not see Jones, Reginald, Money White or his grandmother while in the bedroom. White further testified that when

Humphrey arrived, defendant grabbed her by her collar, put a small pistol to her head and then forced her into the bedroom; defendant demanded that Humphrey give him her purse, which she did, but he then gave it back to her and demanded that she give him $400 but Humphrey gave him $300; defendant then took White to a bathroom and warned him against calling the police; and White subsequently untied his grandmother. White also testified that he was not a drug dealer.

James White's testimony was substantially the same as his brother's except that he stated that defendant demanded $380 from Humphrey instead of $400 and that when he, his brother and Green first entered the apartment, Daniels left the apartment.

Chestina Humphrey testified that she arrived at the apartment at approximately 4:30 p.m., rang the doorbell at the outer door and knocked on the inner door, and was admitted by defendant, who was holding a gun; that when defendant demanded $500 from her she gave him $300 from her wallet; that she did not have a purse but was carrying her wallet in a bag and that she did not give either to defendant; that defendant told her he wanted the money because it was owed to him by her nephew for some merchandise he took from defendant's gang; that she promised to give defendant $200 if he returned the next day; that defendant placed her in the bedroom with R.T. and James White and Green; and that defendant left the apartment at approximately 5 p.m. Approximately one hour later her nephew called the police. Humphrey also denied waking defendant "from her couch," demanding that he leave the apartment, and taking money from his wallet.

Chicago police officer Freddie Carter also testified with respect to statements he alleged defendant made to him that he did not rape Jones and "would they drop the rape charges in return for the 'other guy.'" Carter could not recall what prompted the statements, since defendant had been arrested for an "investigation for home invasion." (Defendant later denied making these statements.)

It further was established that Humphrey's bedroom was in disarray after the incident; papers, "belongings," and boxes were strewn around the room, her mattress was off her bed, and the telephone was off the hook and torn out of the wall. Also established during trial was the fact that defendant had pleaded guilty to a burglary charge in 1978 and received three years' probation, in 1980 he pleaded guilty to an "attempt theft from person charge" and received seven days in the house of corrections, and he received four years in the Illinois Department of Corrections for a robbery and aggravated

battery conviction in 1982.

After closing arguments, the jury, during its deliberation, sent out two questions to the trial judge. The first one was "Originally there were five charges; why are there only four now?" The judge answered that "That is a legal matter. Please deliberate on the four counts before you." The second question was, "Considering we weren't allowed to hear the co-defendant's testimony our question is, were opposing lawyers legally allowed to call Ronald Daniels as their witness?" The trial judge's response to this question was, "You have heard all the testimony and evidence and have been given all the law applicable to this case. Please continue your deliberations." There is no dispute that the trial judge read both the questions and answers to defendant's attorney and the prosecutors before sending his answers to the jury, and defense counsel gave his approval along with the prosecutors.

Subsequently the jury found defendant guilty of armed robbery and defendant was sentenced to 16 years' imprisonment. This appeal followed in which defendant argues, as stated previously, that he was not proved guilty beyond a reasonable doubt, he was prejudiced by the court's failure to properly answer the two questions propounded by the jury during its deliberation, and his sentence is excessive.

■■ ■ We find defendant's jury questions argument dispositive of this appeal. Although defendant did not object either at the time or by post-trial motion to the answers given by the judge to the jury's questions, if prejudice to defendant resulted we may, in the interest of justice, review this matter based upon the plain error rule. (107 Ill. 2d R. 615(a); see also *People v. Land* (1975), 34 Ill. App. 3d 548, 340 N.E.2d 44.) We also observe that although a trial judge has no right to answer a question asked by a jury that calls for him to make a conclusion on his view of the evidence (*People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819), a judge in a criminal case does have the right, and in fact a duty, to clarify an explicit question on a point of law arising from facts over which there is doubt or confusion (*People v. Kucala* (1972), 7 Ill. App. 3d 1029, 288 N.E.2d 622). "This is true even though the jury was initially given proper instructions." *People v. Morris* (1980), 81 Ill. App. 3d 288, 290-91, 401 N.E.2d 284.

■ In the instant case, we believe the trial judge's answers to both questions submitted by the jury prejudiced defendant's right to a fair trial. Failure to explicitly answer both questions left the door open for the jury to entertain any number of inferences to resolve its apparent confusion. With respect to the jury's first question of why they were to consider only four charges when they had been in-

structed that there would be five, the trial judge could have replied by simply telling the jury the attempted armed robbery charge had been nol-prossed by the State and then given them a definition thereof, *i.e.*, that the term in essence means that the State decided not to proceed against defendant on that charge. By not doing so, however, the jury could have inferred, as defendant argues, that the court was being lenient in dropping the charge or that defendant had pleaded guilty to the missing charge. On the other hand, a response from the trial judge concerning *nolle prosequi* could have led the jury to conclude that the State did not have enough evidence to support the attempted armed robbery charge and, therefore, perhaps the evidence presented was, after all, insufficient to support the armed robbery charge. Additionally, perhaps the jury was considering finding defendant guilty of the lesser charge of attempted armed robbery and was confused when it found no instructions regarding that charge and, therefore, was influenced to find defendant guilty of armed robbery.

With respect to the second question concerning whether opposing attorneys were legally allowed to call Ronald Daniels as their witness, and the trial judge's response that the jury heard all the testimony, evidence, and law applicable to the case, the judge could simply have advised the jury that Daniels had a constitutional right not to testify at defendant's trial. In not doing so, and the jury having received an instruction that the parties' attorneys have a right to interview witnesses to determine what their testimony will be, the jury could have inferred, as defendant argues, that Daniels was not called as a witness because defendant's attorney had learned through an interview with him that his testimony would be damaging to defendant; for example, he would not corroborate defendant's version of the incident.

We find these possible inferences critical in this case based upon the fact that the jury did not find defendant guilty on the charges of home invasion, aggravated criminal sexual assault, and criminal sexual assault, thus evincing that it did not find the State's witnesses very credible. We can only speculate what the jury's determination as to the armed robbery finding would have been had it been given more explicit answers to its questions. Those answers may have or may not have tipped the scales in defendant's favor, but, in any event, we find the fact that the jury expressed confusion on points of law and the trial court had a duty to, but did not, clarify the questions in the minds of the jurors, prejudiced and deprived defendant of a fair trial and constituted reversible error.

In light of the above, we find it unnecessary to discuss the other issues raised by defendant.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial.

Reversed and remanded.

LORENZ, P.J., and SULLIVAN, J., concur.