NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220899-U

NO. 4-22-0899

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 1, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| CALVIN L. HARRIS, | ) | No. 18CF1284 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice DeArmond and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed defendant's conviction for armed robbery.

¶ 2        In December 2018, the State charged defendant, Calvin L. Harris, with one count of armed robbery with a firearm, a Class X felony (720 ILCS 5/18-2(a)(2) (West 2018)). In July 2022, a jury found defendant guilty, and the trial court later sentenced him to 21 years in prison.

¶ 3        Defendant appeals, arguing (1) the trial court erred by failing to answer a jury question and (2) he was substantially prejudiced by the State's improper comments during closing argument. We disagree and affirm.

¶ 4                    I. BACKGROUND

¶ 5                   A. The Charges

¶ 6        In December 2018, defendant was charged by information with one count of armed robbery with a firearm, a Class X felony (*id.*). The State alleged generally that in

December 2018, defendant robbed Cody Cedeno at gunpoint.

¶ 7                             B. The Trial Evidence

¶ 8            In July 2022, the trial court conducted a jury trial at which the following evidence was presented.

¶ 9                             1. *Cody Cedeno*

¶ 10            Cody Cedeno testified that in December 2016, he was a manager at a Casey's gas station on Fox Creek Road in Bloomington, Illinois. As manager, one of his duties was to deposit money at the bank. On December 16, 2018, at around 1 p.m., Cedeno gathered the money and receipts into bank bags and left the gas station to take the cash deposits to the bank. As he walked to his car in the parking lot, Cedeno saw a blue Chevy Equinox parked backwards into the spot next to his car with a "heavier set person" wearing a camouflage hoodie reclined in the driver's seat. He did not see any other person in the car.

¶ 11            As Cedeno opened his car door, someone came from behind him, held a silver gun to his face, and demanded the money. The robber was wearing "a silky metallic—or like silver, sweatshirt," which was different from the sweatshirt he saw the driver in the Equinox wearing. Cedeno allowed the robber to search him and take the bank bags out of his pockets. The robber also took Cedeno's keys and phone and then ordered Cedeno to walk toward the back of his own car and get into the trunk. Cedeno complied with the robber's demands, and the robber closed the trunk door. Once Cedeno heard the Equinox's door shut, he pulled the trunk's emergency release and got out of the trunk. His cellphone and keys were on the ground next to his car. Cedeno immediately ran into the store to call the police, but not before he saw the Equinox pull out of the parking lot and onto the road.

¶ 12            When police officers arrived, Cedeno told them what had occurred, describing the

Equinox and that he believed the robber was a male, "over six feet tall, from 300 to 400 pounds," who wore a mask and had a deep male voice. One of the officers then drove Cedeno to a traffic stop involving a blue Equinox for a "show up" to see if he recognized the car's occupants. Cedeno identified the stopped Equinox as looking like the one that had been parked next to his car at the Casey's. He also told officers that the man in the car had the same physical build as the robber. Neither of the car's occupants, however, were wearing sweatshirts.

¶ 13                                    2. *William Buchanan*

¶ 14        Officer William Buchanan testified that he was a police officer with the Bloomington Police Department. On December 16, 2018, Buchanan and several other officers were "dispatched to a report of an armed robbery" at a Casey's in Bloomington. While Buchanan drove towards the Casey's, dispatch updated him that "the suspects were two males African American heavyset, last seen in a light blue Chevy Equinox, and the vehicle had last turned right out of the parking lot from Casey's on the Fox Creek Road." Buchanan saw a blue Equinox and pulled the vehicle over. The driver appeared to be a heavyset black man, but Buchanan later learned she was a woman, Mary Harris. Her brother, who was a heavyset black man, was also in the car, seated in the backseat on the car's passenger side. Buchanan identified the brother as defendant in court.

¶ 15                                    3. *Timothy Marvel*

¶ 16        Officer Timothy Marvel testified that he was a police officer with the Bloomington Police Department. On December 16, 2018, Marvel responded to a dispatch for the armed robbery at Casey's. When he arrived, two other officers were inside speaking with Cedeno. At that moment, a call came in that Buchanan had stopped the suspect vehicle. Marvel recommended that the other officers take Cedeno to the traffic stop to see if he could identify the

suspects. Marvel accompanied them to the location of the traffic stop, where he observed a silver gun in the mesh pocket on the back of the passenger-side seat of the Equinox.

¶ 17                                      4. *Mary Harris*

¶ 18          Mary Harris testified that she was defendant's sister and was a former assistant manager at the Casey's on Fox Creek Road. Harris testified that she alone committed the robbery, without defendant's involvement, and was convicted for that robbery in 2019. Harris stated that she chose Cedeno as her mark because she had stopped working at the Casey's before he was hired. She knew Cedeno would leave the store around midday to deposit the money. Harris stated that on the day of the robbery, she had been alone all day prior to and during the robbery. Defendant was only present at the traffic stop because she had picked him up just after leaving Casey's, following the robbery. She recalled wearing a camouflage jacket at that time.

¶ 19          Harris testified that prior to her arriving at Casey's, defendant called and asked her to pick him up from a house that was near the gas station, but she did not plan on picking him up. When she arrived at the Casey's parking lot, she backed her car into the spot next to Cedeno's car and waited for Cedeno to come out of the building. When Cedeno began opening his car door, Harris got out of her car, shutting the door behind her. She then walked around the back of her car and put a gun in Cedeno's face, demanding he give her the bags of money, which he had in his hands. Harris took the bags, walked Cedeno towards the back of his car, opened his trunk, took his phone, and "had him put himself into his trunk." Harris then shut the trunk on Cedeno. Money in hand, she placed Cedeno's phone on the ground next to his trunk and left the Casey's parking lot in her own car.

¶ 20          Because Harris realized that she was likely to get in trouble for the robbery, she decided to pick her brother up, figuring that if she got into trouble, she could place the "blame

- 4 -

the situation on him."

¶ 21      Harris at first testified that she took a left out of the parking lot but then corrected herself to say she took a right and called her brother on the phone to let him know she would pick him up. Harris was unable to recall what the house looked like where she picked up her brother or precisely where it was located. When Harris arrived at the house, defendant got into the passenger-side backseat of the car, and Harris headed home. While en route, she was pulled over by police officers and arrested. At the police department, Harris submitted to a recorded interview with officers, portions of which were played for the jury.

¶ 22      During the interview, Harris told the detective that she went to Casey's to put air in her tires and not to rob anyone. Normally, she would go to a different Casey's that was closer to her home, but she went to the Casey's on Fox Creek Road because defendant had told her to. She had been with defendant that entire day and felt like the "whole thing" was a setup by defendant because he kept asking her questions. Harris said that "it was a motive for the mother fucker being down there. Because I never see my family ever, but my brother—I've been in Bloomington for years he never visits my house until now."

¶ 23      Harris told the detective that when she was at the Casey's, all she did was get out, air up her tires, and pull off. At some point, defendant exited the car. Harris said she heard a little scream but did not elaborate because she did not want to incriminate defendant. When the detective told Harris "we know it wasn't you that stuck the gun in [Cedeno's] face," she responded, "[N]or did I know that was about to take place." Harris told the detective that when defendant got back into the car, he told Harris to "go," and she pulled away. He also told her not to pull over for the police.

¶ 24                          C. Closing Arguments

¶ 25       During rebuttal argument, the State made the following comment:

> "Now with regard to the cell phones, during this investigation there was no need to look for communication between the defendant and his sister. They were together the entire day. There would be no need for planning and communication. It was only three and a half years after the incident took place, the first time we are hearing this story from Mary Harris that they weren't together—"

¶ 26       Defendant objected to the portion of the State's argument referring to the passage of three and a half years before hearing Mary's story for the first time, and the trial court sustained the objection. The State then restated its argument without the inclusion of that particular sentence.

¶ 27                              D. Jury Deliberations

¶ 28       During deliberations, the jury sent the trial court a note, which the court read as follows: "[A]re we able to know what [defendant's] legal status was during the last three and a half years? Was he tried previously?" The court asked the State and defense counsel what response they thought would be proper and proposed to answer as follows: "Ladies and gentlemen, please consider the evidence that was presented during trial and the law which the Court has instructed." Both parties agreed to that response, and the court tendered it to the jury. Later, the jury sent a note back saying they could not reach a verdict. The court instructed the parties to continue deliberating, and the next day the jury returned a guilty verdict.

¶ 29                              E. Posttrial Proceedings

¶ 30       In August 2022, defendant filed a motion for new trial, asserting that (1) the State failed to prove him guilty beyond a reasonable doubt and (2) the State's closing argument

regarding its statement that "[i]t was only three and a half years after the incident took place, [and] the first time we are hearing this story from Mary Harris ***," amounted to the State vouching against Harris's credibility, prejudicing defendant.

¶ 31    In September 2022, following a hearing, the trial court denied defendant's motion. The court explained that (1) it had sustained an objection to the State's argument regarding the "three and a half years," (2) the jury was instructed about what it could consider as evidence, (3) the jury heard the two different versions of Harris's story and could decide her credibility on that basis, and (4) the jury likely sent the note regarding the "three and a half years" because it "wanted to know why it took so long to get this case to trial."

¶ 32    After denying defendant's motion, the trial court conducted a sentencing hearing and sentenced defendant to 21 years in prison.

¶ 33    This appeal followed.

¶ 34                    II. ANALYSIS

¶ 35    Defendant appeals, arguing (1) the trial court erred by failing to answer a jury question and (2) he was substantially prejudiced by the State's improper comments during closing argument. We disagree and affirm.

¶ 36            A. The Trial Court's Response to the Jury's Question

¶ 37    Defendant contends that the trial court erred by referring the jury back to the originally tendered instructions in response to the jury's question regarding defendant's status during the three and a half years prior to trial. Defendant acknowledges that he did not preserve the issue for review by contemporaneously objecting to the court's response to the jury's question. However, defendant argues that we can review the issue as either plain error or ineffective assistance of counsel.

¶ 38                    1. *Plain-Error Review Is Inapplicable Here*

¶ 39          "The plain-error doctrine provides that a reviewing court may consider

unpreserved errors if 'a clear or obvious error occurred' and either (1) 'the evidence is so closely

balanced that the error alone threatened to tip the scales of justice against the defendant,' or

(2) the 'error is so serious that it affected the fairness of the defendant's trial and challenged the

integrity of the judicial process.' " *People v. Baker*, 2022 IL App (4th) 210713, ¶ 61 (quoting

*People v. Birge*, 2021 IL 125644, ¶ 24, 182 N.E.3d 608). However, "[w]hen defense counsel

affirmatively acquiesces to actions taken by the trial court, any potential claim of error on appeal

is waived, and a defendant's only available challenge is to claim he received ineffective

assistance of counsel." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 29, 92 N.E.3d 494.

¶ 40          Here, the trial court consulted with defense counsel regarding how to respond to

the jury's note asking about defendant's status for the prior three and a half years. Because

counsel acquiesced to the court's response, defendant waived plain-error review, and we instead

review his argument as ineffective assistance of counsel.

¶ 41                    2. *The Applicable Law and the Standard of Review*

¶ 42                       a. Ineffective Assistance of Counsel

¶ 43          Claims of ineffective assistance of counsel are governed by the framework set

forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "To prevail on a claim of ineffective

assistance of counsel, a defendant must demonstrate that counsel's performance was deficient,

and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL

113688, ¶ 36, 987 N.E.2d 767. To show deficient performance, defendant must establish that

counsel's performance was objectively unreasonable under prevailing professional norms.

*People v. Veach*, 2017 IL 120649, ¶ 30, 89 N.E.3d 366. To show prejudice, defendant must

establish that there exists a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Id.* "A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Id.* A defendant must satisfy both prongs to prevail on a claim of ineffective assistance of counsel. *Id.*

¶ 44                      b. Response to Jury Questions

¶ 45        "Generally, jurors are entitled to have their questions answered. [Citations.] When the jury asks a question on a point of law, when the original instructions are incomplete, or when the jurors are manifestly confused, the court has a duty to answer the question and clarify the issue in the minds of the jurors." *People v. Lewis*, 2022 IL 126705, ¶ 58, 211 N.E.3d 375. However, a trial court may exercise its discretion to refrain from answering the jury's question under the following circumstances:

> "[W]hen (1) the jury instructions are readily understandable and sufficiently explain the relevant law, (2) further instructions would serve no useful purpose or could mislead the jury, (3) the jury's inquiry involves a question of fact, or (4) the court's answer would cause it to express an opinion that would likely direct a verdict one way or the other." *Baker*, 2022 IL App (4th) 210713, ¶ 65.

¶ 46                      3. *This Case*

¶ 47        Here, the jury asked the trial court, "[A]re we able to know what [defendant's] legal status was during the last three and a half years? Was he tried previously?" After discussion with the parties, the court returned the following answer: "Ladies and Gentlemen, please consider the evidence presented during trial and the law which the court has instructed." Defendant contends that the court's answer was erroneous, tantamount to no answer at all, and

should have more clearly answered the jury's question. We disagree.

¶ 48      The jury's question is a question of fact. The jury wanted to know if defendant had been previously tried for the offense. Even if construed as a question of law—that is to say, whether the jury could even be told whether defendant had been previously tried—further instruction on that point would serve no useful purpose and could mislead the jury. Either way, the trial court was well within its discretion to direct the jury back to the evidence and the instructions.

¶ 49      Defendant cites to *People v. Flynn*, 172 Ill. App. 3d 318, 323-24, 526 N.E.2d 579, 582-83 (1988), *People v. Morris*, 81 Ill. App. 3d 288, 290-91, 401 N.E.2d 284, 285-86 (1980), and *People v. Brouder*, 168 Ill. App. 3d 938, 948, 523 N.E.2d 100, 106 (1988), in support of his argument that the trial court's response was inadequate, but each of those cases are factually distinguishable. In *Flynn* the jury asked (1) why they were to consider only four charges when they had been instructed that there would be five counts and (2) whether the lawyers were legally allowed to call a codefendant to testify. *Flynn*, 172 Ill. App. 3d at 323. In *Morris*, the jury asked whether "a person [who] comes into possession of property obtained illegally by another[,] can he be presumed guilty of burglary even though he, himself, may never have illegally entered the building or removed the property." (Internal quotation marks omitted.) *Morris*, 81 Ill. App. 3d at 290. And in *Brouder*, the jury, deliberating whether the State had proven the charge of resisting a peace officer, asked several questions indicating that they were confused about the meaning of "knowing resistance." *Brouder,* 168 Ill. App. 3d at 948.

¶ 50      Because each of these cases involved questions that bear no factual similarity to the one asked in by the jury in the present case, we conclude that the cases defendant relies upon are inapposite and unpersuasive. We further conclude that the trial court did not abuse its

discretion by answering the jury's question in the manner that it did.

¶ 51     Accordingly, because the trial court's response to the jury's question was proper, defendant cannot establish either that (1) his attorney performed deficiently by failing to object to the court's response or (2) he was prejudiced by his counsel's alleged failure. Therefore, his claim of ineffective assistance of counsel fails.

¶ 52     B. The State's Closing Argument

¶ 53     1. *The Applicable Law and the Standard of Review*

¶ 54     "A defendant is entitled to a fair trial free from irrelevant evidence and prejudicial comments by the State." *People v. Stewart*, 2023 IL App (1st) 210912, ¶ 75. However, the State "still has wide latitude in making a closing argument and may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant." *People v. Williams*, 2022 IL 126918, ¶ 44, 210 N.E.3d 1207. "Such comments should be considered in the context of the entire closing argument." *Id.*

¶ 55     Relevant to this case, the State "may argue that a witness is or is not credible but may not personally vouch for the credibility of a witness or use the credibility of the state's attorney's office to bolster a witness's testimony." *People v. Potts*, 2021 IL App (1st) 161219, ¶ 280, 196 N.E.3d 961. If the State made such an improper comment, then reversal is required if that comment caused " 'substantial prejudice,' such that a reviewing court cannot determine whether the verdict resulted from [it]." *Williams*, 2022 IL 126918, ¶ 54. However, the State's comment in closing argument must be both "improper and substantially prejudicial. If it fails to meet either description, it is not reversible error." *Id.* ¶ 49.

¶ 56     In *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 50, 115 N.E.3d 270, this court set forth the standard of review applied when reviewing allegations of prosecutorial

misconduct in closing argument, writing as follows:

> "The Illinois Appellate Court is divided on whether to apply an abuse of discretion standard or *de novo* review when reviewing allegations of prosecutorial misconduct. See Ryan T. Harding, *Division in the Illinois Appellate Court: What is the Appropriate Standard of Review for Alleged Prosecutorial Misconduct During Closing Argument?*, 38 N. Ill. U. L. Rev. 504, 508-12 (2018). The First District has applied an abuse of discretion standard. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 102, 997 N.E.2d 947. The Third District and this court have consistently applied *de novo* review. *People v. Palmer*, 382 Ill. App. 3d 1151, 1160, 889 N.E.2d 244, 251 (2008); *People v. McCoy*, 378 Ill. App. 3d 954, 964, 881 N.E.2d 621, 631-32 (2008). Consistent with our court's established precedent, we will continue to apply *de novo* review. *Palmer*, 382 Ill. App. 3d at 1160 (citing *Wheeler*, 226 Ill. 2d at 121); *State Farm Fire & Casualty Co. v. Yapejian*, 152 Ill. 2d 533, 539-540, 605 N.E.2d 539, 542 (1992) (decision of an appellate court is not binding upon other appellate districts)."

Accordingly, we apply a *de novo* standard in this case.

¶ 57                                 2. *This Case*

¶ 58          Defendant argues that the trial court erred by failing to grant his motion for a new trial because the State's comment regarding the three and a half years between Harris's interview and the trial was "improperly vouching against [her] credibility," that substantially prejudiced defendant. We disagree.

¶ 59          Although the trial court sustained defendant's objection to the State's comment— namely, "It was only three and a half years after the incident took place, the first time we are

hearing this story from Mary Harris that they weren't together"—we do not agree that the comment was improper. It is well established that a prosecutor may argue that a witness is not credible but should avoid arguing that he personally believes a witness is not credible. The prosecutor's comments here amount to the former and not the latter.

¶ 60    Here, the State simply commented during argument that (1) three and a half years had passed since Harris was interviewed by the police and implicated her brother in the robbery and (2) during that time, she made no effort to attempt to exonerate him by telling any official the story she told the jury—namely, that defendant had nothing to do with the robbery. The State properly argued that these circumstances gave rise to the reasonable inference that if defendant had no part to play in the robbery, a truthful Harris would have said something sooner to attempt to exonerate him. We note that such an inference could have perhaps been made more explicit had the State simply asked Harris when she testified, "When exactly it was that you realized your prior statements were untruthful?"

¶ 61    In addition, we reiterate what this court wrote in *People v. Pope*, 284 Ill. App. 3d 695, 707, 672 N.E.2d 1321, 1329 (1996):

> "[W]e expressly reject the notion that a prosecutor improperly crosses the bounds of asserting his personal views regarding witnesses' credibility *** if the jury has to *infer* the prosecutor is doing so from his comments. *** [F]or a prosecutor's closing argument to be improper, he must *explicitly* state that he is asserting his personal views, stating for example, 'this is my personal view.' " (Emphases in original).

¶ 62    Even if we agreed with defendant that the comment was improper, we agree with the trial court that any potential prejudice caused by that comment was minimal and quickly

mitigated by the court. First, the comment was brief and isolated in the context of the closing argument, amounting to no more than one sentence of 20 pages of transcript. See *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 139, 2 N.E.3d 1143 ("A significant factor in determining the impact of an improper comment on a jury verdict is whether the comments were brief and isolated in the context of lengthy closing arguments." (Internal quotation marks omitted.)).

¶ 63    Second, the trial court sustained defendant's objection to the State's comment and instructed the jury (1) to disregard information for which an objection was sustained and (2) that closing arguments were not evidence. See *People v. Ramsey*, 239 Ill. 2d 342, 438, 942 N.E.2d 1168, 1221 (2010) ("[T]he act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice." (Internal quotation marks omitted.)).

¶ 64    Last, any prejudicial effect regarding Harris's credibility was further nullified by Harris's own statements to the police in a recorded interview, which was played for the jury at trial. In effect, the jury was given two stories to consider—namely, the story told through (1) Cedeno's testimony, which was mostly corroborated by Harris's prior interview statements and (2) Harris's implausible trial testimony, which contradicted her interview statements. In short, it is highly unlikely that the State's comment regarding Harris's change of heart years later could have affected the jury's view of her credibility more than her own contradictory statements. Accordingly, defendant was not substantially prejudiced by the State's comment.

¶ 65                              III. CONCLUSION

¶ 66    For the reasons stated, we affirm the trial court's judgment.

¶ 67    Affirmed.